**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MELANIE DEFALCO,                    CASE NO. 2:21-cv-10386

    *Plaintiff,*                    HON.  MARK A. GOLDMAN
*v.*                                DISTRICT JUDGE

COMMISSIONER OF SOCIAL              HON. PATRICIA T. MORRIS
SECURITY,                          MAGISTRATE JUDGE

    *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 20, 23)

### I.    RECOMMENDATION

Plaintiff Melanie Defalco challenges the Commissioner of Social Security regarding a final decision denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The case was referred to the undersigned for review.  (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3).  For the reasons below, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 20), and **GRANTING** the Commissioner's motion (ECF No. 23).

### II.    REPORT

#### A. Introduction and Procedural History

Prior to making the current application for benefits, Plaintiff filed claims on October 16, 2015 for DIB and SSI, alleging disability as of August 23, 2015.  (ECF No. 17, PageID.154).  On September 12, 2017, following a hearing before an Administrative Law

Judge ("ALJ"), Plaintiff was found not disabled from August 23, 2015 through the date of the decision.  (*Id*. at PageID.154-169).

On July 6, 2018, Plaintiff again filed for DIB and SSI, alleging disability as of August 2, 2014.[1]  (*Id*. at PageID.341, 348).  She alleges disability due to bipolar disorder, a lower back condition, cirrhosis of the liver, right-sided Carpel Tunnel Syndrome ("CTS"), fibromyalgia, and a chronic sinus condition.  (*Id*. at PageID.373).

Following the denial of the claim at the initial level, Plaintiff requested a hearing, held December 20, 2019 before ALJ Patrick J. MacLean.  (*Id.* at PageID.101, 227, 238, 285).  Plaintiff, represented by a non-attorney representative, testified, as did a Vocational Expert ("VE").  (*Id*. at PageID.105, 142).  On January 17, 2020, ALJ MacLean found that Plaintiff was not disabled from the amended alleged onset of disability date of September 13, 2017 through the date of the decision.  (*Id*. at PageID.81-95).  On November 24, 2020, the Appeals Council denied review of the administrative decision.  (*Id*. at PageID.67-69).  After receiving an extension of time to file a civil action, Plaintiff filed suit in this Court on February 22, 2021.  (*Id*. at PageID.63); (ECF No. 1).

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."

---

[1] She later amended the alleged onset of disability date to September 13, 2017, one day after the previous denial of benefits.  (ECF No. 17, PageID.103).

*Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only-'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018).  The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset of disability date of September 13, 2017. (ECF No. 17, PageID.84). At step two, the ALJ found the following severe impairments: "adjustment disorder with mixed anxiety and depression; bipolar II disorder; panic disorder with agoraphobia; generalized anxiety disorder; history of learning disability; obesity; asthma; fibromyalgia; chronic sinus infections; history of lumbar degenerative disc disease and sacroiliac joint dysfunction; and history of carpal tunnel syndrome ("CTS")." (*Id.*). The ALJ found that the conditions of gastroesophageal reflux disease ("GERD"), calcaneal spur of the right foot, bursitis of the right ankle, piriformis syndrome, and trochanteric bursitis non-severe.[2] (*Id.*). At step three, he found that none of the impairments met or

---

[2] "Piriformis syndrome is a condition in which the piriformis muscle, located in the buttock region, spasms and causes buttock pain." https://www.cedars-sinai.org.health-library/diseases-and-conditions /p/piriformis-syndrome. (Last visited May 18, 2022). "The piriformis muscle also can irritate the nearby sciatic nerve and cause pain, numbness and tingling along the back of the leg and into the foot." *Id.*

medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix

1.  (*Id.* at PageID.85).

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to

perform exertionally light work with the following additional limitations:

> [N]o climbing ladders, ropes, or scaffolds; occasionally climb ramps or
> stairs; occasionally balance, stoop, crouch, kneel, and crawl; frequent
> handling, fingering, and feeling objects bilaterally; avoid concentrated
> exposure to extreme cold, extreme heat, wetness or excessive humidity; only
> occasional exposure to excessive environmental irritants such as fumes,
> odors, dusts, and gases; avoid concentrated use of hazardous moving
> machinery; avoid all exposure to unprotected heights; work is limited to
> simple, routine, and repetitive tasks performed in a work environment free
> of fast-paced production requirements involving only simple, work-related
> decisions and with few, if any, workplace changes; and only occasional
> interaction with the public and co-workers. .

(*Id.* at PageID.87).  At step four, the ALJ found that Plaintiff could not perform her past

relevant work as a receptionist or housekeeper.  (*Id.* at PageID.94).  At step five, the ALJ

cited the VE's testimony in support of his determination that Plaintiff could perform a

significant number of jobs in the national economy including work as an inspector, bench

assembler, and packer (*Id.* at PageID.95, 146).  Accordingly, the ALJ concluded that

Plaintiff was not disabled.  (*Id.* at PageID.96)

---

Trochanteric bursitis is inflammation . . . of the bursa (fluid-filled sac near a joint) at the outside . . .point
of the hip known as the greater trochanter." my.clevelandclinic.org/health/diseases/4964-trochanteric-
bursitis.  (Last visited, May 18, 2022).

### E. Administrative Record

###    i.    Medical Evidence[3]

In May 2017, Plaintiff reported significant improvement in left-sided neck pain with the use of Meloxicam. (*Id*. at PageID.587). August 2017 records by Community Care Services note Plaintiff's request for "something stronger for [her] anxiety." (*Id*. at PageID.567). She appeared anxious but fully oriented with good personal care. (*Id*. at PageID.567). The same records note a diagnosis of bipolar II as of February 2017. (*Id*. at PageID.568).

In September 2017, Plaintiff sought treatment for back pain, reporting that the pain was exacerbated by stress and standing. (*Id*. at PageID.473). Treating records by Beaumont Health – Westland note a history of chronic lower back pain due to a herniated disc, joint dysfunction, and a history of fibromyalgia. (*Id*. at PageID.472). Plaintiff also reported a recent increase in frequency of asthma symptoms requiring the use of an inhaler up to three times a day. (*Id*. at PageID.473). Examination records show tenderness of the sacrolumbar spine with a positive straight leg test on the right but a normal range of motion. (*Id*. at PageID.474). Plaintiff demonstrated a normal range of motion, normal breath sounds, and a normal mood and affect. (*Id*.). Melissa Jennings, M.D. noted current prescriptions for Flexeril, Mobic, and Lyrica. (*Id*. at PageID.476). She recommended stretching and exercise for back pain. (*Id*.). She prescribed Zyrtec and Flonase for allergies. (*Id*. at PageID.476). In March 2018, Plaintiff sought treatment for lingering flu

---

[3] Records predating the relevant period beginning on September 13, 2017 are included for background purposes only.

symptoms.  (*Id*. at PageID.478).  Treating records note a normal range of motion with normal mood, affect, behavior, judgment, and thought content.  (*Id*. at PageID.480).

March 2018 counseling records note a diagnosis of bipolar disorder and a panic disorder with agoraphobia.  (ECF No. 17, PageID.545, 591). April 2018 progress notes by Community Care Services state that Plaintiff was "neat and clean" and did not report recent "medical issues or emergencies." (*Id*. at PageID.458, 460).  Goals included "develop[ing] an income." (*Id*. at PageID.458, 598).  Plaintiff reported "adequate" health insurance.  (*Id*. at PageID.466).  Her life skills included being able to "provide beyond basic needs of daily living." (*Id*. at PageID.467).  She was found to experience "recurrent mental health symptoms" affecting her ability to live independently but was not a danger to others. (*Id*.). Records state that she lived with her boyfriend but was "very isolated" without "community involvement of any kind." (*Id*. at PageID.469).  Physical treating records from the same month show a normal range of motion and a normal mental status.  (*Id*. at PageID.488). May 2018 records show 5/5 strength in all extremities.  (*Id*. at PageID.497).  Plaintiff reported that she was "a little depressed" due to a family death.  (*Id*. at PageID.499).

June 2018 treating records by Aysha Athar, D.O. note Plaintiff's report of chronic fatigue and ankle swelling.  (*Id*. at PageID.623).  Plaintiff reported that she did not exercise but was "outdoors more playing with grandkids . . . [four] days a week." (*Id*.).  She exhibited a normal range of motion and psychological state. (*Id*. at PageID.625).  In August 2018, Plaintiff was advised to "eat lightly" after reporting abdominal pain.  (*Id*. at PageID.617).

In September 2018, Thomas Flake, M.D. performed a non-examining review of treating and consultative records, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push/pull without limitation. (*Id*. at PageID.191). He found that she was precluded from the use of ladders, ropes, or scaffolds but could perform otherwise occasional postural activity. (*Id*.). In regard to manipulative limitations, he found a limitation to frequent (as opposed to *constant*) bilateral handling, fingering, and feeling. (*Id*. at PageID.192). He found that Plaintiff should avoid concentrated exposure to temperature extremes, wetness, humidity, and airborne contaminants and avoid *all* exposure to hazards such as machinery and heights. (*Id*. at PageID.192-93).

On October 18, 2018, Hugh D. Bray performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of poor sleep, depression, anger, frustration, and lack of motivation. (*Id*. at PageID.579). Plaintiff reported good relationships with others before leaving a job as a receptionist in 2011. (*Id*. at PageID.579). She reported that at the time of Dr. Bray's exam she had no friends and only fair relationships with neighbors. (*Id*. at PageID.580). She reported that she could perform housekeeping chores, laundry, manage finances, prepare simple meals, and shop independently but these activities were performed slowly due to physical issues. (*Id*. at PageID.580).

Dr. Bray observed a logical thought process with a depressed mood. (*Id*. at PageID.581). He found a "guarded to poor" prognosis and that Plaintiff would be unable

to manage benefit funds.  (*Id*. at PageID.582).  He found moderate limitation in relating to others; in ability to understand, remember, and carry out tasks; in concentration; and the ability to handle the pressure of part-time work.  (*Id*. at PageID.582).  He found marked limitation in the ability to "withstand stress and pressure associated with" full time work.  (*Id*. at PageID.583).

On October 30, 2018 Dyan Hampton-Aytch, Ph.D. performed a non-examining review of the treating and consultative records, finding that Plaintiff experienced mild limitation in understanding remembering, and applying information; interacting with others; and adapting or managing herself.  (*Id*. at PageID.188).  She found moderate limitation in concentration, persistence, or pace.  (*Id*.).

June 2019 records note that Plaintiff's ankle pain had improved since onset one week earlier.  (*Id*. at PageID.602).  She was diagnosed with a calcaneal spur of the right foot.  (*Id*. at PageID.603).  Records from the following month note her report of right foot numbness and shooting pain.  (*Id*. at PageID.599).  Later in July 2019, Plaintiff received an injection for left hip and low back pain.  (*Id*. at PageID.595-96).

### ii.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff offered the following testimony:

She was born May 12, 1975.  (ECF No. 17, PageID.105).  She left school after 10th grade and later attempted without success to obtain a GED.  (*Id*. at PageID.105-06).  She lived with a friend in a townhouse in Romulus, Michigan.  (*Id*. at PageID.106).  Her bedroom was in the basement.  (*Id*.).  She experienced leg pain climbing the flight of stairs

from the basement to the kitchen and bathroom.  (*Id*. at PageID.107).  She used the stairs three to four times a day.  (*Id*. at PageID.108).  She was able to prepare meals, care for her personal needs, and do laundry chores.  (*Id*. at PageID.110, 124).  She shopped for groceries independently but at a slow pace due to physical limitations.  (*Id*. at PageID.110-11).  She had not driven since losing her license years earlier due to the failure to pay the fine for a traffic violation.  (*Id*. at PageID.124).  She relied on her housemate or a neighbor for transportation.  (*Id*. at PageID.111, 124).  She did not use transportation offered by her insurance provider since contracting a skin condition while using the insurance-provided service.  (*Id*.).

Before ceasing work in 2015, Plaintiff worked as a housekeeper at a motel.  (*Id*. at PageID.112).  She stopped working after injuring her back moving furniture.  (*Id*. at PageID.113).  Prior to the housekeeping job, she held jobs as a receptionist and a janitor. (*Id*. at PageID.114-117).

Plaintiff took Naproxen for body pain and Albuterol for occasional breathing problems.  (*Id*. at PageID.118-119).  She took Klonopin and Lexapro for anxiety and depression and Lyrica for fibromyalgia.  (*Id*. at PageID.120-122).  She believed that she was unable to work due to the combination of back problems, her mental health conditions, her discomfort being around other people, and problems adjusting to change.  (*Id*. at PageID.122-123).  She experienced nighttime sleep disturbances.  (*Id*. at PageID.123).  She had not traveled out of town since attending her grandmother's funeral in Florida in 2017. (*Id*. at PageID.125).  She did not have hobbies and did not attend religious services or dine out.  (*Id*. at PageID.126).

She was unable to sit for more than 15 minutes or stand/walk for more than 10 due to back pain and lower extremity radiculopathy.  (*Id*. at PageID.127).   She did not require the use of a cane.  (*Id*.).   She was limited to lifting less than 10 pounds on an occasional basis.  (*Id*. at PageID.129).  She experienced right hand numbness and swelling due to CTS. (*Id*. at PageID.130).   Due to memory problems, she had on occasion forgotten to take medication.  (*Id*.).   She was unable to focus on a television show for more than four minutes.  (*Id*. at PageID.131).   Television shows sometimes triggered memories of past traumatic events.  (*Id*.).   She was able to play games and read articles on her cell phone. (*Id*. at PageID.132).   On one occasion (prior to the period under consideration) she sought emergency treatment for anxiety but had not received inpatient treatment for mental health conditions. (*Id*. at PageID.134).  She smoked "once or twice a month." (*Id*. at PageID.135).

In response to questioning by her representative, Plaintiff reported that her relationship with her housemate was characterized by conflicts and yelling.  (*Id*. at PageID.137).  She had a generally good long-distance relationship with her mother, marked by occasional arguments about money.  (*Id*. at PageID.138-139).   She stopped psychological counseling because she did not believe that it improved her condition.  (*Id*. at PageID.140).   She was prescribed psychotropic medication by her primary care physician.  (*Id*.).   She reported limited improvement in her mental condition from the prescribed medications.  (*Id*. at PageID.141).

### iii.     The Vocational Expert's Testimony at the Administrative Hearing

Citing the *Dictionary of Occupational Titles* ("DOT"), the VE classified Plaintiff's former work as a receptionist as exertionally sedentary and semiskilled, DOT code 237.367-038; and housekeeper/cleaner, light (medium as performed) and unskilled, DOT code 323.687-014.[4]  (*Id.* at PageID.143-144).

The ALJ then posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, education, and work history:

> [A]ble to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, and light work as defined by the regulations.  No climbing ladders, ropes or scaffolds.  Occasionally climb ramps or stairs.  Occasionally balance, stoop, crouch, kneel, and crawl.  Frequent handling, and fingering, and feeling objects . . . . bilaterally . . . . Avoid concentrated exposure to extreme cold, extreme heat, wetness, or excessive humidity. . . .[L]imited to occasional exposure to environmental irritants such as fumes, odors, dust, and gases.  Avoid concentrated use of hazardous moving machinery.  And, avoid all exposure to unprotected heights. . . . [W]ork is limited to simple, routine, and repetitive tasks, performed in a work environment free of fast paced production requirements, involving only simple work-related decisions, and with few, if any, workplace changes.  Only occasional interaction with the public and coworkers.

(*Id.* at PageID.144-145).

The VE testified that the above limitations would preclude all of Plaintiff's past relevant work but would allow for the light, unskilled work of an inspector (about 90,000 positions in the national economy), DOT code 222.687-042; bench

---

[4] Under 20 C.F.R. § 404.1567(a-d), *sedentary* work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" and *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

assembler (125,000), DOT code 723.684.018; and packer (160,000), DOT code 920.687-026. ((*Id*. at PageID.146).  The VE testified further that if the above-described individual were limited to sedentary work, she could perform the jobs of assembler (70,000), DOT code 739.687-066; inspector (60,000), DOT code 669.687-014; and sorter (72,000), DOT code 521.687-026.  (*Id*. at PageID.147).

The VE testified, based on her "professional knowledge and experience," that the need to be off task more than 15 percent of the workday or miss more than one day of work each month would preclude all competitive employment.  (*Id*. at PageID.147-148).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for

impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).[5]

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school

---

[5] The Court cites only to the sections of the Code of Federal Regulations pertaining to DIB claims. *Craft v. Astrue*, 539 F.3d 668, 674, n.6 (7th Cir. 2008)("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case. For simplicity, we will cite only to the DIB sections.").

psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

16

The SSA will also consider the "consistency" of the claim.  This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]"  *Id.* § 404.1520c(c)(3).  This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)  Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)  Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*  The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area

of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single

analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about

whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will

carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)  The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)  The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)  The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)  The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

#### a. Dr. Bray's October 2018 Consultative Findings

Plaintiff argues that the ALJ erred by rejecting Dr. Bray's October 2018 consultative finding of marked limitation in the ability to "withstand stress and pressure associated with day-to-day full time work activities." (ECF No. 20, PageID.645-650) citing (ECF No. 17, PageID.583). In turn, the Commissioner argues that the ALJ's partial

rejection of Dr. Bray's findings is supported by the treating and non-examining records and should thus remain undisturbed.  (ECF No. 23, PageID.667-676).

The Social Security regulations adjudge a claimant's mental functioning on a five-point scale.  20 C.F.R. Pt. 404, Subpt. P, App'x.,1 12.00F(2).

> a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.
>
> b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
>
> c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
>
> d. Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
>
> e. Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

*Id.* at § 12.00(F)(2)(a)-(e).

The question of whether a claimant has a marked limitation is critical because in some instances, a marked limitation could be found to be incompatible with the ability to perform full-time work.  *Hogston v. Comm'r of Soc. Sec.*, No. 16-1475, 2016 WL 9447154, at *5 (6th Cir. Dec. 29, 2016) (remand for reconsideration of a medical opinion and "both VEs' testimony that the marked limitations described in [the medical] reports would preclude all work activity.").

Contrary to Plaintiff's argument, the ALJ's rationale for rejecting Dr. Bray's findings of marked limitation in the ability to withstand the stress of full-time work is well supported and explained.  As a threshold matter, the ALJ provided a thorough discussion of his reasons for finding no more than moderate psychological limitation in any category.

First, he found that Plaintiff experienced moderate psychological limitation in understanding, remembering, and applying information, citing her ability to engage in semiskilled work in the past and normal memory testing. (*Id*. at PageID.86). Second, in interacting with others, ALJ noted that despite Plaintiff's claim that she disliked being around others, she was "able to form a rapport" during the consultative examination by Dr. Bray. (*Id*.). He also noted that she was able to babysit and play outdoors with children and admitted in her application for benefits that she had "no problems" getting along with others. (*Id*. at PageID.86, 408). The ALJ found that while Plaintiff experienced some degree of limitation in concentrating, persisting, and pace, he adopted Dr. Bray's finding that the concentrational limitations were no more than moderate. In support of the finding of only moderate limitation in adaptation, the ALJ also observed that Plaintiff was able to care for her own needs and had not sought emergency treatment for psychological symptoms. (*Id*. at PageID.86-87).

Aside from the above findings, the ALJ devoted over an entire page of his determination to Dr. Bray's discrete observations and conclusions. He acknowledged Dr. Bray's finding that Plaintiff "struggled" with concentration, attention, persistence, and effort during the exam but "was nonetheless able to perform simple, repetitive tasks." (ECF No. 17, PageID.91). The ALJ went on to find that Dr. Bray's finding of marked limitation in the ability to complete "day to day full time work activities" was "not persuasive," noting that Plaintiff's ability to live with a friend, prepare meals, clean, do her own laundry, grocery shop, and care for her personal needs stood at odds with the "marked" finding. (*Id*. at PageID.86-87, 93). In further support of his finding of no more than moderate

psychological limitation, the ALJ cited treatment records from November 2017 and June 2018 showing that Plaintiff was able to care for her grandchildren.[6] (*Id*. at PageID.87, 550, 623). He noted that Plaintiff reported good results from psychotropic medication prescribed by primary care sources and that treating records consistently showed normal mood and affect. (*Id*. at PageID.93). Aside from the rejection of the "marked limitation" finding, the ALJ rejected Dr. Bray's conclusion that Plaintiff would be unable to manage benefit funds, citing Plaintiff's own report and the report of her friend that she was able to pay bills and count change. (*Id*. at PageID.93, 406, 424).

Plaintiff also faults the ALJ for failing to acknowledge that Dr. Bray found a "guarded to poor" prognosis. (ECF No. 20, PageID.646) citing (ECF No. 17, PageID.582). However, it well settled that the ALJ is not required to discuss every piece of evidence so long he has identified substantial evidence in support of his conclusions. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508, 2006 WL 305648, at *10 (6th Cir. 2006) ("ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party."). The ALJ discussed his reasons for rejecting a portion of Dr. Bray's findings in great detail; having explained he did not find marked psychological limitation, he was not required to provide a separate discussion of why

---

[6] The November 2017 treating records appear to state that the children were in fact the grandchildren of her housemate. (ECF No. 17, PageID.550). The fact that they were not her own grandchildren does not change the analysis. *Garmhausen v. Comm'r of Soc. Sec.*, No. 1:20-CV-539, 2022 WL 442958, at *5 (W.D. Mich. Feb. 14, 2022) (Medical source's finding of marked psychological limitation undermined by, among other activities, the claimant's ability to babysit).

Plaintiff's prognosis was not "guarded to poor." While in her reply brief, Plaintiff faults the ALJ for declining to adopt all of Dr. Bray's findings, it was well within his purview to adopt portions of those findings and reject others. (ECF No. 24, PageID.686-688). *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727-728 (6th Cir. 2013) (rejecting contention ALJ was "bound" by one medical opinion - ALJ "properly based her RFC determination on *all* the evidence of record") (emphasis added).

Plaintiff also disputes the ALJ's inference that she stopped attending counseling sessions because she no longer required treatment, arguing that she discontinued psychological counseling in October 2018 because she found the sessions ineffective and because she contracted a skin condition riding the van made available by her medical insurance. (ECF No. 20, PageID.646). However, the ALJ did not discount Plaintiff's allegations of psychological limitation solely because she declined to continue psychological counseling, but observed that the subsequent records by the primary care providers showed full orientation and a normal mood and affect. (ECF No. 17, PageID.91). While Plaintiff argues that the primary care providers lacked insight into her psychological issues, there is no evidence that she asked for a referral for counseling services or otherwise pursued additional mental health care treatment. (*Id*.); (ECF No. 20, PageID.646-647). Moreover, the records show that following the discharge from counseling services, Plaintiff sought care for exclusively physical complaints. (ECF No. 17, PageID.91). While she claims that she declined treatment in part because she did want to use the transportation

services provided by her insurer, she was able to procure alternative transportation to the subsequent appointments for physical treatment on a fairly regular basis.

Plaintiff also takes issue with the ALJ's finding she could handle her own finances, noting that she relied on food stamps and her mother's assistance for necessities. (*Id*. at PageID.649-650). However, Plaintiff's financial constraints due to joblessness cannot be equated with the inability to handle money in general. The ALJ permissibly cited Plaintiff's own statement that she was capable of handling money to reject Dr. Bray's opposite conclusion. (*Id*. at PageID.93, 406, 424).

Finally, Plaintiff cites *Brooks v. CSS,* 531 F. App'x 636, 642 (6th Cir. 2013), in arguing that Dr. Bray's conclusions were entitled to more weight than the non-examining findings of Dr. Hampton-Aytch. (*Id*. at PageID.648). This argument is based on no longer applicable regulations setting forth a descending hierarchy of medical sources which accord presumptively controlling weight to a treating source; less deference to a consultive source such as Dr. Bray; and the least deference to a non-examining one. *See* 20 C.F.R. § 404.1527(c)(1). But for claims made on or after March 27, 2017 the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Plaintiff's argument that Dr. Bray's opinion was erroneously discounted in favor of a non-examining source's is particularly weak, given that the ALJ also rejected Dr. Hampton-Aytch's finding of mild limitation in the ability to

understand, remember, and apply information; interact with others; and in adaptation, instead finding moderate limitation in these areas.  (ECF No. 17, PageID.93).

Accordingly, the ALJ's rejection of Dr. Bray's finding of marked limitation does not warrant a remand.

### b.  The Subjective Complaints

Plaintiff also disputes the ALJ's finding that her subjective complaints were not wholly consistent with the medical evidence.  (ECF No 20, PageID.650-653).  She argues, in effect, that her ability to perform activities such as laundry and shopping on an as-needed basis does support the RFC for a significant range of exertionally light work.  (*Id*. at PageID.652).  She contends that the condition of right-sided CTS compromises her ability to perform grasping and fine manipulations, noting that two of the three light jobs cited by the VE, bench assembler and packer, require manual dexterity.  (*Id*. at PageID.653). In turn, the Commissioner argues that ALJ's evaluation of the subjective claims is well supported by the record and accordingly entitled to the deference of the Court.  (ECF No. 23, PageID.676-684) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001)).

 SSR 16–3p sets forth the standard for evaluating the alleged limitations using a two-step process. 2016 WL 1119029, at *3 (Mar. 16, 2016). First, the ALJ determines whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id.*  Here, the ALJ acknowledged that the psychological conditions, obesity, asthma, fibromyalgia, chronic sinus infections,

lumbar degenerative disc disease, sacroiliac joint dysfunction, and history of CTS caused significant work-related impairments. (ECF No. 17, PageID.84).

Second, an ALJ must evaluate claims of limitation not reflected in the objective evidence. SSR 16-3p at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. The ALJ recounted Plaintiff's hearing testimony that she was unable to work due to back problems and difficulty being around others. (ECF No. 17, PageID.88). He listed her prescribed medications for both the psychological and physical conditions. (*Id.*). He noted her testimony that she was socially isolated and fought with her mother on occasion. (*Id.*).

The ALJ rejected Plaintiff professed degree of psychological and physical limitation, noting that while she sought treatment for back pain in September 2017, treatment records from March, April, May, and August 2018 and May 2019 showed an unremarkable physical condition despite reports of fatigue. (*Id*. at PageID.89); *see* (*Id*. at PageID.488, 497, 499, 625). He noted that July 2019 records showed "no back-related abnormalities." (*Id*.). He observed that while the records documented "a history of CTS," there was "essentially no evidence of treatment for same since the alleged onset date and physical exams reflect no evidence of hand related abnormalities such as reduced grip strength or deficits with hand dexterity." (*Id*.).

Plaintiff correctly notes that her ability to shop, prepare meals, and do laundry on an isolated basis does show that she can perform full-time work. *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) (ability to drive, grocery shop, wash dishes and sweep floor on an intermittent basis does not equate with the "ability to engage in substantial gainful activity").   However, the ALJ's determination was based not only on Plaintiff's daily activities, but as discussed here, the treating and non-examining records showing a mostly unremarkable psychological and physical state.   Plaintiff's argument that the ALJ exaggerated the import of the daily activities or relied solely on them in support of his determination is without merit.   *See Leach v. Colvin*, No. 13-13571, 2015 WL 540701, at *10 (E.D. Mich. Feb. 10, 2015) (Berg, J.) (ALJ did not err in determining that the claimant's daily activities, conservative treatment, opinion evidence, and treating records, considered together, undermined her allegations of disabling symptoms).

 Plaintiff also contends that the manipulative limitations in RFC for frequent handling, fingering, and feeling objects bilaterally did not adequately account for her limitations caused by her CTS.   (ECF No. 20, PageID.652-653).   This argument fails for two reasons.   First, the finding that Plaintiff could perform bilateral handling, fingering, and feeling on a frequent basis is based on Dr. Flake's identical non-examining findings. (*Id*. at PageID.87, 192).   Second, the ALJ correctly noted that the treatment records for the relevant period "reflect no evidence of hand related abnormalities such as reduced grip strength or deficits with hand dexterity." (*Id*. at PageID.90).   Because the ALJ's choice of manipulative limitations set forth in the hypothetical question to the VE are supported by substantial evidence, Plaintiff argument that the ensuing job testimony did not reflect a

greater degree of manipulative limitation is moot.  Plaintiff's claim that the restriction to frequent manipulative activity found in the RFC does not reflect her full degree of limitation, fails for the same reasons.  It is well settled that an ALJ is not required to incorporate unsubstantiated claims in hypothetical question to VE or by extension, in the RFC.  *Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir. 1994).

### Conclusion

For these reasons, I recommend **DENYING** Plaintiff's motion, (ECF No. 20), and **GRANTING** Defendant's motion, (ECF No. 23).

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to

be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 24, 2022                                 S/ PATRICIA T. MORRIS
                                                             Patricia T. Morris
                                                             United States Magistrate Judge